# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00104-2 |
| | ) | |
| **[2] TODD WHITE** | ) | |

## MEMORANDUM OPINION

Pending before the Court is Todd White's Supplemental Motion for Compassionate Release (Doc. No. 540), to which the Government has responded in opposition (Doc. No. 543), and White has replied (Doc. Nos. 546, 557). For the reasons that follow, White's Motion will be granted and he will be released from custody under certain conditions.

## I. Background

On August 30, 2017, a federal grand jury returned a six-count Superseding Indictment against ten defendants. (Doc. No. 11). In Count One, all Defendants were charged with conspiring to distribute and possessing with intent to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). White was not named in any other count.

White pled guilty and, as part of his plea agreement, admitted to being responsible for the distribution of 13 kilograms of methamphetamine over the course of the 17 month conspiracy. This resulted in a base offense level of 34. However, because of White's prior record and because the Government filed an information under 21 U.S.C. § 851 asserting prior drug convictions (Doc. No. 326), he was deemed a Career Offender and subject to a base offense level of 37. With a three-point reduction for acceptance of responsibility and a criminal history category VI, the Guidelines range for sentencing was 262 to 327 months imprisonment.

Prior to sentencing, the Government filed a Motion for Downward Departure and requested

a 222-month sentence. (Doc No. 410). This represented a 15% reduction from the low end of the guideline range and was based upon White's apparent truthfulness with the Government during debriefing sessions.

On October 23, 2018, White was sentenced to a 136-month term of imprisonment, to be followed by 5 years of supervised release. In imposing the below-Guidelines sentence, the Court throughly considered the Section 3553(a) factors, but focused on three specific areas that warranted a lower sentence.

First, according to the Presentence Report ("PSR"), White's personal history and characteristics were about as far from ideal as possible. He was born and spent the first two years of his life in the Georgia State Mental Institution where his mother, an epileptic, was committed after suffering a mental breakdown. (PSR ¶ 66). White's biological father, who he did not know, committed suicide on an unspecified date. (Id.).

At the age of two, White was adopted, but was primarily raised by his mother in Georgia. After his parents divorced when he was 12, he spent every weekend with his adoptive father, who was an alcoholic. (Id. ¶ 67). Summers were spent in North Carolina with relatives, but this was no mere vacation. There, over a period of eight years, White was sexually abused by an older cousin. (Id. ¶ 68).

White's family "struggled" with his homosexuality. His mother eventually accepted his sexuality after counseling failed to "cure him," but his sisters did not. (Id. ¶ 69). At the age of 16, he contracted the human immunodeficiency virus ("HIV"), and that illness has led to continuing medical issues over the years.

Second, even though White was deemed a career offender because of his prior drug

convictions, his criminal history points overstated the nature of his criminal record. Of the 18 criminal history points (not counting the 2 added because he was under a criminal justice sentence at the time of his present offense), 8 of those points were based upon five convictions for driving related offenses.

Third, in addition to HIV, White had "a lot of health issues" that were either "life threatening" or "potentially life threatening." (Sentencing Transcript, Doc. No. 494-1 at 5). In 2007, he was diagnosed with Hepatitis B, and in 2016 with Hepatitis C. (PSR ¶ 75). Then, in October of 2017, White was diagnosed with anal cancer for which he received six weeks of radiation treatment at a hospital in Elizabethtown, Kentucky.

White also had mental issues, having reportedly suffered post-traumatic stress disorder as a result of the childhood sexual abuse. Because of his medical and/or mental issues, he received $1,025 per month in Social Security Disability benefits. (Id, ¶¶ 76, 80).

At sentencing, the Court specifically recommended to the Bureau of Prisons that White be "house[d] at SCP-Lexington, FCI-Butner or [an]other medical facility due to [his] serious medical problems." (Doc. No. 493, Judgment at 2). He is presently incarcerated at FCI-Butner Medium II, and has been continuously detained since his arrest on June 9, 2017. White is now 50 years old, and has served almost 43 months for his role in the conspiracy.

## II. Application of Law

"By statute, a federal court 'may not modify a term of imprisonment once it has been imposed.'" United States v. Alam, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release[.]" Id. This includes motions under the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, which

3

Case 3:17-cr-00104   Document 572   Filed 01/27/21   Page 3 of 16 PageID #: 3288

amended § 3582(c)(1)(A) and allows inmates to file reduction-of-sentence motions after exhaustion of administrative remedies.

Recently, the Sixth Circuit had occasion to discuss in detail compassionate release and the First Step Act in the context of COVID-19. Acknowledging that "[t]he First Step Act and COVID-19 have redefined the compassionate release landscape" in this "*annus horribilis*," the Sixth Circuit in United States v. Jones instructed district courts to consider compassionate release by undertaking a three-step inquiry:

> At step one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). At step two, a court must "find[ ]" whether "such a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission." Id. § 3582(c)(1)(A) (emphasis added). The Commission's policy statement on compassionate release resides in U.S.S.G. § 1B1.13. See U.S.S.G. § 1B1.13 (U.S. Sent'g Comm'n 2018). Thus, if § 1B1.13 is still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13] to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." Dillon, 560 U.S. at 827, 130 S. Ct. 2683.13 At step three, "§ 3582(c)[ (1)(A) ] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." Id.

980 F.3d 1098 at 1101, 1107-08 (6th Cir. 2020) (emphasis in original).

The Sixth Circuit in Jones also explained, however, that where, as here, an inmate (as opposed to the BOP) files the request for compassionate release, "§ 1B1.13 does not appl[y]" and the district court "can skip[] the second step." Id. at 1108; see also United States v. Belcher, No. 219CR000191JRGCRW, 2020 WL 7480552, at *4 (E.D. Tenn. Dec. 18, 2020) (stating that in light of Jones, "the Court will exercise its discretion to skip an analysis under § 1B1.13 in favor of an analysis under § 3553(a)'s factors"); United States v. Pooler, No. 3:18-CR-00137, 2020 WL 7046964, at *7 (S.D. Ohio Dec. 1, 2020) (noting that the court "'may skip'—and does skip—the

4

[second] step, in accordance with the Sixth Circuit's Jones decision"); United States v. Lamar, No. 18-20183, 2020 WL 7319431, at *4 (E.D. Mich. Dec. 10, 2020) (observing that the government's argument based upon § 1B1.13 "is a dead letter after the Sixth Circuit's decision in Jones"). Accordingly, the Court turns to "compelling and extraordinary" circumstances and the § 3553(a) factors in considering White's request for compassionate release.

**A. Compelling and Extraordinary Circumstances**

White seeks compassionate release because of his many and significant health problems and his belief that, were he to become infected with COVID-19, he would become extremely sick or die. The Government comes close, but does not quite concede that White has presented compelling and extraordinary circumstances for purposes of the First Step Act. That is, the Government acknowledges that "compelling and extraordinary" circumstances can exist "where an inmate presents a chronic medical condition identified by the CDC as a risk factor for a more severe outcome from COVID-19," but asserts that White's "number of ailments, including two different types of cancers, HIV, Hepatitis B, and multiple physical injuries" do not rise to that level. (Doc. No. 543 at 10).

"Congress did not define the term 'compelling and extraordinary reasons' within the First Step Act, but, instead, directed the U.S. Sentencing Commission to 'describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.'" United States v. Gwaltney, No. 3:17-CR-00381 (PGS), 2020 WL 5983161, at *2 (D.N.J. Oct. 8, 2020) (citing 28 U.S.C. § 994(t)); United States v. Lynn, No. 4:18-CR-00255-01-SWW, 2020 WL 3799052, at *1 (E.D. Ark. July 7, 2020) (same). For that reason, many courts (including this one) looked to § 1B1.13 of the Sentencing Guidelines and its

5

policy statements for guidance in determining whether such circumstances exist. See United States v. White, No. 3:17-CR-00098, 2020 WL 4530931, at *2 (M.D. Tenn. Aug. 6, 2020) (finding "compelling and extraordinary circumstances" where it was "consistent with applicable policy statements issued by the Sentencing Commission"); United States v. Calloway, No. 3:16-CR-00121, 2020 WL 3510684, at *1 (M.D. Tenn. June 29, 2020) (noting it was "hotly debated" whether court could consider catchall "other reasons" under § 1B1.13 when determining the existence of compelling and extraordinary reasons). Post-Jones, however, that approach is unnecessary because the Sixth Circuit held that, absent further action by the Sentencing Commission in light of the continued lack of a quorum, "district courts have full discretion to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." Jones, 980 F.3d at 1109.

Several months after COVID-19 made its appearance in this country, this Court entered a Memorandum Opinion in which it observed that "[t]his far into the global pandemic, COVID-19 needs no introduction and merits little discussion given the havoc it has wreaked" including "[t]he constant and daily reminders of its existence, its still unknown long term impact on the body, and the need to be ever-vigilant[.]" United States v. Duncan, No. 3:11-CR-00012, 2020 WL 4669944, at *5 (M.D. Tenn. Aug. 12, 2020). At the time of that decision on August 12, 2020, the World Health Organization ("WHO") calculated that COVID-19 "ha[d] led to more than 727,000 deaths worldwide and more than 160,000 deaths in the United States[.]" Id. Today, a mere five months later (after lockdowns and other precautions), the number of deaths worldwide has risen to 2,141,468, with 417,889 deaths from COVID-19 in the United States alone. See, https://covid19.who.int (all websites last visited 1/27/2021). Also as of this date, there have been

6

25,050,308 confirmed cases in the United States. (Id.).

Notwithstanding the exponential rise in the number of cases and deaths, two constants which the Court identified in Duncan remain and should be considered when addressing COVID-19 in the prison environment.

First, COVID-19 is a particularly virulent form of the coronavirus that is easily transmitted from person-to-person. Even those who are asymptomatic can spread the disease. For this reason, the Centers for Disease Control ("CDC") has established guidelines and recommendations to control its spread. This includes washing hands often; avoiding touching one's eye, nose, and mouth with unwashed hands; avoiding close contact with people who may be sick; social distancing (at least 6 feet) when not at home; cleaning and thoroughly disinfecting frequently touched surfaces; and monitoring one's health daily. See, www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick.

Second, there are certain individuals who stand a much better chance than others of becoming extremely sick or even dying if they contract COVID-19. The CDC has recognized as much by identifying a number of high risk categories, including older adults, and those with certain underlying medical conditions. Individuals who have cancer, chronic kidney disease, chronic obstructive pulmonary disease (COPD), an immunocompromised state (weakened immune system) from a solid organ transplant, serious heart conditions, sickle cell disease, and type II diabetes mellitus are at increased risk of severe illness or death from COVID-19. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/. Individuals with moderate to severe asthma, cerebrovascular disease, cystic fibrosis, hypertension (high blood pressure), an immunocompromised state due to certain procedures or diseases, certain neurological conditions, liver disease, pulmonary fibrosis, and type I diabetes mellitus might have an increased risk of severe

7

illness or death. Id..

The CDC recognizes that "COVID-19 is a new disease," and that "there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19." Id. In fact, just this month variants to the SARS-CoV-2 strain were identified that may (or may not) allow the virus to spread more quickly, lead to "more severe or less severe illness," and "evade vaccine-induced immunity." https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html

Clearly, COVID-19, which has been described as a "once-in-a-lifetime pandemic," United States v. Atwi, 455 F. Supp. 3d 426, 430 (E.D. Mich. 2020), and a "once-in-a-lifetime public health crisis," Jones v. Hill, No. 1:20-CV-02791-JPB, 2020 WL 7664773, at *3 (N.D. Ga. Dec. 24, 2020), presents a significant problem in a prison environment where social distancing is often impractical. United States v. Rodriguez, 451 F. Supp. 3d 392, 402 (E.D. Pa. 2020) (noting that "[p]risons are ill-equipped to prevent the spread of COVID-19" and that "[p]ublic health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer"). This is true even where the virus has not entered a particular institution because of the possibility of rapid spreading. United States v. Rae, No. CR 15-432, 2020 WL 4544387, at *3 (E.D. Pa. Aug. 6, 2020) (noting that "to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it"); United States v. Ortiz, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020) (stating that "the crowded nature of federal detention centers

8

presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread"); United States v. Hansen, No. 17 CR 50062, 2020 WL 2219068, at *2 (N.D. Ill. May 7, 2020) (observing that "if and when [COVID-19 enters an institution], it is likely to spread more quickly than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison environment and the constant influx of people coming and going from outside the prison, including correctional staff.").

In this case, there are presently 87 inmates and 13 staff members who have tested positive for COVID-19. https://www.bop.gov/coronavirus/index.jsp. Further, 225 inmates and 5 staff members at that institution have recovered from that virus. Id.

Of course, "the mere presence of COVID-19 in a particular prison cannot justify compassionate release," United States v. Seymon, No. 11-10040, 2020 WL 2468762, at *4 (C.D. Ill. May 13, 2020), otherwise "every inmate in that prison could obtain release," United States v. Calloway, No. 3:16-CR-00121, 2020 WL 3510684, at *2 (M.D. Tenn. June 29, 2020) (citation omitted). See also, United States v. Williams, No. CR PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) ("The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card.'"). Instead, it is the presence of COVID-19 in conjunction with a significant medical condition or conditions that can constitute "significant and compelling circumstances." Put simply, "'[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility.'" United States v. Blevins, No. 20-7053, 2020 WL 7691726, at *1 (4th Cir. Dec. 28, 2020) (quoting United States v. Feiling, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020)).

9

In moving for compassionate release, White notes that he has a number of serious medical conditions, "including two different types of cancers, HIV, Hepatitis C and Hepatitis B, as well as multiple physical injuries." (Doc. No. 540 at 3). Not all of those ailments and conditions rise to the level of "extraordinary and compelling circumstances," even in light of COVID-19.

It is true that White has previously been diagnosed with Hepatitis B and C, and those are diseases that affect the liver. It remains unknown, however, whether the existence of hepatitis by itself makes one more likely to suffer an adverse result from COVID-19. According to the CDC, an individual with liver disease "might be at an increased risk for severe illness from COVID-19," but it currently has "no information about whether people with Hepatitis B or Hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions; see United States v. Duford, 471 F. Supp. 3d 458, 462 (D.N.H. 2020) (noting that "CDC guidance does not currently list hepatitis C as a high-risk condition").

White's history of cancer may be more problematic. As noted previously, he was diagnosed with anal cancer in 2017, and underwent 6 weeks of radiation treatment. After White was sentenced in this case, however, he was diagnosed with invasive squamous cell cancer of the tongue. This led to a partial glossectomy (resection of the tongue) on November 20, 2019, and he completed radiation treatment in March 2020. (Doc. No. 543-1 at 5, 488, 493-525). According to the National Cancer Institute, "[h]aving cancer increases [one's] risk of severe illness from COVID-19," although "[a]t this time, it is not known whether having a history of cancer increases [one's] risk for severe illness from COVID-19." https://www.cancer.gov/about-cancer/coronavirus.

What is of greater concern under CDC guidelines is White's HIV status. "Based on limited

10

Case 3:17-cr-00104   Document 572   Filed 01/27/21   Page 10 of 16 PageID #: 3295

data," the CDC "believe[s] people with HIV who are on effective HIV treatment have the same risk for COVID-19 as people who do not have HIV," but the same cannot be said for all HIV patients. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv. To the contrary, the CDC notes that "people who have serious underlying medical conditions might be at increased risk for severe illness," and this "includes people who have weakened immune systems." Id. In fact, "[t]he risk for people with HIV getting *very sick* is greatest in [p]eople with a low CD4 cell count, and [p]eople not on effective HIV treatment (antiretroviral therapy or ART)." Id. (emphasis added).

"CD4 cells are white blood cells that fight infection." United States v. Pooler, No. 3:15-CR-14-J-39PDB, 2020 WL 6505044, at *1 (M.D. Fla. Nov. 5, 2020). Such cells "help identify, attack, and destroy bacteria and viruses that enter the body," but "when a patient is infected with HIV, the HIV infects and kills the patient's CD4 cells." Underwood v. Corr. Med. Servs., No. CIV.A. 09-10448, 2011 WL 692164, at *2 (E.D. Mich. Jan. 13, 2011).

"'A healthy immune system normally has a CD4 count ranging from 500 to 1400 cells per cubic millimeter of blood.'" United States v. Carter, No. CR 107-076, 2020 WL 4194014, at *2 n.4 (S.D. Ga. July 21, 2020)) (citing www.webmd.com/hiv-aids/cd4-count-what-does-it-mean). "At levels below 200, a person becomes susceptible to opportunistic infections.'" Id.

According to BOP records, White's CD4 count "remains low." (Doc. No. 493-1 at 24). That is an understatement. On August 17, 2020, he had an a CD4 count of 57; on June 20, 2020 it was 59; on March 26, 2020, his CD4 count was less than 50; and on January 27, 2020, his CD4 count was 60. (Id. 23, 70, 140, 148). Admittedly, the medical records suggest that these low numbers may have been attributable to White receiving radiation treatment for his oral cancer, (id. at 173), but they are seriously low numbers nonetheless. Moreover, White's low numbers preceded his diagnosis

11

of tongue cancer. For example, he had a CD4 count of 127 in October 2019, and a count of 89 in July 2019. (Id. at 282). Indeed, in an October 16, 2019 report it was indicated that White had a "persistent" and "longstanding low CD4 count <200." Id. at 289.

None of this is to suggest that White has not received treatment for his HIV and various other ailments while in the custody of the BOP. Quite the contrary, White has been seen on countless occasions by the medical staff during his period of incarceration, and has been prescribed a host of medications. The fact remains, however, that even with medication and treatment, his CD4 numbers are dangerously low, placing him at serious risk of severe illness or death should he have the misfortune of contracting COVID-19. This constitutes "compelling and extraordinary" circumstances for purposes of the First Step Act. See, United States v. Villa-Valencia, No. 16-20008-07-DDC, 2020 WL 7263894, at *3 (D. Kan. Dec. 10, 2020) (finding defendant's medical conditions, including hypertension and HIV with a low CD4 count, "constitute an extraordinary and compelling circumstance because his ability to provide self-care is substantially diminished in prison and he is not expected to recover if he contracts COVID-19"); United States v. Van Praagh, No. 1:14-CR-00189-PAC-1, 2020 WL 3892502, at *4 (S.D.N.Y. July 10, 2020) (finding "extraordinary and compelling" circumstances where defendant was HIV-positive and had low CD4 count because he was "at high risk should he contract COVID-19"); United States v. Moody, No. 05-80121-CR, 2020 WL 4059659, at *3 (S.D. Fla. May 15, 2020) (observing that even though there are no reported cases of COVID-19 within defendant's facility, "there have been significant outbreaks at BOP facilities around the country" and "[w]ere one to occur at [defendant's] facility, his severely low CD4 count makes him uniquely vulnerable to the virus").

## B. Section 3553(a) Factors

A finding of compelling and extraordinary circumstances does not end the inquiry. This is because the Sixth Circuit has "repeatedly recognized that district courts may deny relief under the § 3553(a) factors even if 'extraordinary and compelling' reasons would otherwise justify relief." United States v. Ruffin, 978 F.3d 1000, 1008 (6th Cir. 2020).

The § 3553(a) factors are well-known to sentencing judges. They include such things as the nature and circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence to criminal conduct and protect the public from future crimes of the defendant, and the applicable guidelines range. 18 U.S.C. § 3553(a). Those factors were thoroughly considered when this Court sentenced White on October 23, 2018. Many things have not changed since then, and this Court's discussion of those factors is incorporated by reference herein. See Jones, 980 F.3d at 1113-14 (noting that "[t]he obligation to explain is imperative when the original sentencing judge and the compassionate release decision judge are different persons, as the original sentencing transcript does not reflect the latter judge's factual reasons for their § 3582(c)(1)(A) decision"; United States v. Keefer, No. 19-4148, 2020 WL 6112795, at *4 (6th Cir. Oct. 16, 2020) (emphasis in original) ("In th[e] common scenario [where the same judge is called upon to consider a compassionate release request], a district court will *already* have considered and balanced the § 3553(a) factors the first time around at the original sentencing.").

The nature and circumstances of the offense and White's history and general characteristics are largely the same now as they were at the time of sentencing. White admitted to being responsible for the distribution of 13 kilograms of methamphetamine. By any measure, that is a large amount. Moreover, even though White was not the "CEO of the conspiracy" (Liam Glenn was), he "played

13

a very important role." (Doc. No. 494-1, Sentencing Transcript at 2). And, although his criminal history category VI overstated his actual danger to society because of the multiple points for driving convictions, his criminal record then, as now, is troubling. His felony drug convictions alone show a "profound disrespect of the law,"(Id. at 3).

On the other hand, there was no evidence that White used a firearm during his participation in the conspiracy, nor does he have any firearm related convictions. (Id. at 3). When caught, he presented substantial and helpful assistance to law enforcement. This included not only information about local dealers, but also information relating to sources who had Mexican connections. In short, White "provide[d] important cooperation to the Government" and gave up suppliers of methamphetamine, "not just the little sources[.]" (Id. at 4). At a minimum, this suggests an effort to do the right thing.

White's family background and upbringing has obviously not changed either. The Court has already discussed his childhood and simply adds here that because of his own choices – including a 7-year methamphetamine addiction – his life has "lacked a lot of stability," and his parents did not provide the type of "guidance that would have been helpful" during Whites' formative years. (Id. at 5).

What has changed, and significantly so, is the current environment, White's medical status, and the interplay between the two. At the time of sentencing, the Court was fully aware of White having been diagnosed with hepatitis, anal cancer, and HIV. In fact, the Court commented that the cancer "seems to be being treated," and that White's HIV "seemed to be steady" and "ha[d] not matured into anything worse, which is possible." (Id. at 5). The Court did not know at the time that White had a consistent and abysmally low CD4 count, nor could the Court envision that such a count

14

could result in severe illness or death were White to contract a yet-to-exist virus.

The Court could also not predict that White would develop tongue cancer in addition to his previous bout with anus cancer. To this day, the potential impact of COVID-19 on those who are in cancer remission is unknown.

Nor could the Court foresee that, in August 2020, White would be diagnosed with a compression fracture in his back at T8 followed by a "sequential rib fracture." (Doc. No. 493-1 at 5-6). This was in addition to White shattering his right femur shortly before sentencing that resulted in the insertion of a titanium rod, pins, and screws in his leg. (Id. at 181, 537). Bone fractures may not cause concerns in terms of COVID-19, but they do cause pain and mobility issues. In White's case, a back brace might help with pain and "prevent[] further deformity," but braces are not allowed in federal correctional institutions because of security concerns. (Id. at 6).

The Court recognizes the Government's argument that White has served little more than 30% of the sentence imposed, and its concern that he would present a danger to the community were he to be released. This includes not only his prior felony drug convictions, but also a sexual battery conviction.

The sexual battery charge arose after White "grabb[ed] the victim's groin area," and resulted in a probation sentence. (PSR ¶ 28). The incident occurred almost 30 years ago when White was 21, and his record reflects no such further conduct.

Of greater concern to the Court is his prior drug dealing. The Court agrees, and "Congress has declared, that a drug dealer is typically a danger to the community." United States v. Rich, No. 11-20066, 2013 WL 12421638, at *2 (E.D. Mich. Feb. 19, 2013) (citing, 18 U.S.C. § 3142(e)(3)(A)). However, White (at least presumably) has been away from his methamphetamine addiction for the

15

past 3½ years, and has had time to reflect on the choices he has made in a place (prison) that is not to be trifled with. The Court can only hope that White will not revert to his prior lifestyle and will not squander what may be his last chance. See, United States v. Medlin, No. 3:09-CR-00204, 2020 WL 4274199, at *5 (M.D. Tenn. July 24, 2020) (noting that a high risk of debilitating illness or death from COVID-19 should "tend to cool Defendant's enthusiasm for being out and about committing crimes").

When all is said and done, a "district court has substantial discretion" in deciding whether to reduce a sentence. Ruffin, 978 F.3d at 1005. It is for the Court to "weigh whether a certain amount of time is 'sufficient, but not greater than necessary,' to serve § 3553(a)'s purposes." United States v. Kincaid, 805 F. App'x 394, 396 (6th Cir. 2020). The concerns the Government raises about the integrity of the originally imposed sentence are valid, but they do not outweigh the risks given White's life threatening medical conditions and the reality of COVID-19.

### III. Conclusion

On the basis of the foregoing, White's Supplemental Motion for Compassionate Release (Doc. No. 540) will be granted and he will be sentenced to time served, subject to certain conditions.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE